Carmen N. Hermina González, demandante y apelada, *v.* Luis Silva Recio, Secretario del Trabajo del Gobierno de Puerto Rico, y Otros, demandados y apelantes.

Número: O-78-55    Resuelto: 5 de octubre de 1978

*Héctor A. Colón Cruz, Procurador General,* y *Federico Cedó Alzamora, Procurador General Auxiliar,* abogados de los apelantes; *Escribano, Carreras, Acevedo, Pérez & Varela,* abogados de la apelada.

EL JUEZ ASOCIADO SEÑOR DÍAZ CRUZ emitió la opinión del Tribunal.

■ La Sec. 14 de la Ley de Seguridad de Empleo de Puerto Rico (29 L.P.R.A. sec. 713(f)) en sus apartados (1) y (2) ordena:(¹)

"(f) *Prohibición contra actividad política.*—(1) Ningún funcionario o empleado que trabaje en la administración de este Capítulo podrá (A) usar su autoridad oficial o influencia con el propósito de intervenir en una elección o selección de candidatos para cualquier posición, o que afecte el resultado de las mismas, o (B) directa o indirectamente ejercer o intentar ejercer coerción, ordenar o aconsejar a cualquier otro de tales empleados a pagar, prestar o contribuir con parte de su sueldo o compensación o cualquier otra cosa de valor a cualquier partido, comité, organización, agencia o persona para fines políticos. Ninguno de tales funcionarios o empleados podrá tomar parte activa en la dirección de la política o en campañas políticas. Todas dichas personas retendrán el derecho a votar según ellas escojan y a expresar sus opiniones en toda cuestión política y sobre candidatos. A los fines de esta subsección el término 'funcionario o empleado' no incluirá (A) al Gobernador; (B) jefes debidamente electos o nombrados de departamentos ejecutivos del Gobierno de Puerto Rico, o los de cualquier municipio que no pertenezcan al Servicio por Oposición del Gobierno del Estado Libre Asociado; (C) funcionarios que ocupan posiciones electivas.

(2) Cualquier funcionario o empleado que trabaje en la administración de este Capítulo que viole las disposiciones de esta subsección será inmediatamente separado de la posición o del cargo que ocupe y desde ese momento no se usarán fondos asignados por la Asamblea Legislativa o concedidos por cualquier agencia del Gobierno Federal para pagar la compensación de tal persona."

---

(¹) Esta disposición reclama como precedente la Ley Hatch (5 U.S.C. sec. 7324) que en su inciso (a) prohíbe a todo empleado de una agencia ejecutiva del Gobierno federal "participar activamente en la dirección de la política, o en campañas políticas," sostenida por el Tribunal Supremo de los Estados Unidos al extender su ámbito a la organización de un partido o club político, aceptar una candidatura o hacer campaña para un cargo público electivo, dirigir la campaña de un candidato político a cargo público, al dictaminar que la proscripción de estos actos de conducta política partidista no contraviene ni la Primera Enmienda ni ningún otro precepto de la Constitución. *United States Civil Service Com.* v. *National Ass'n of Letter Carriers,* 413 U.S. 548, 556 (1973).

La demandante-apelada Carmen Hermina González hacía cinco años que venía ocupando el puesto de Entrevistadora II, como empleada permanente del Negociado de Seguridad de Empleo del Departamento del Trabajo de Puerto Rico en cuyo cargo no ejercía funciones de confianza ni de formulación de normas ni directrices. Para las elecciones generales de 1976 fue nominada por el Partido Socialista Puertorriqueño candidata al Senado por el Distrito Núm. 3 de Arecibo. Aceptó la nominación y obtuvo primero licencia de maternidad y luego vacaciones acumuladas. Al expirar éstas solicitó licencia sin sueldo por enfermedad, recibiendo como respuesta notificación escrita del Director del Negociado solicitando su renuncia por ser candidata a un puesto político en unas elecciones partidistas, fundada en 29 L.P.R.A. sec. 713(f) citada. Posteriormente el 5 septiembre, 1976 fue removida de su empleo.

El Tribunal Superior ordenó la reposición de la empleada al declarar la transcrita Sec. 14(f) de la Ley Núm. 74 de 21 junio, 1956 (29 L.P.R.A. sec. 713(f)) inconstitucional por limitar irrazonablemente los derechos fundamentales de expresión, libre asociación, igual protección de las leyes y debido proceso, en ausencia de un superior interés del Estado que justifique la restricción. Resolvemos ahora el recurso de apelación del Secretario del Trabajo de Puerto Rico.

En Puerto Rico aspiramos a que el personal gubernamental forme un cuerpo de servidores públicos eficientes, honestos y que en su escala de valores guarden mayor lealtad a su compromiso de servir al pueblo en las distintas áreas que su vocación les ha llevado a ocupar, que al fervor eleccionario por dominar el poder público y envolver los empleados en los vaivenes del patronazgo político. Para proteger a los servidores públicos que honran su vocación tenemos la Ley de Personal y los variados recursos judiciales, inclusive la Ley de Derechos Civiles (Núm. 12 de 8 agosto, 1974 (32 L.P.R.A. sec. 3524)). Esta legislación proclama la política pública pre-

valeciente en nuestro país de aislar el personal de servicio gubernamental de la actividad partidista de modo que la política no dañe el empleo ni lesione al empleado público. El patronazgo es una negación radical de estos buenos principios de administración pública, pues al propiciar la figura absurda del *servidor-público político activo* convierte al empleado en agente destructor de la objetividad esencial para servir al pueblo; en sujeto que se ampara en la concha de seguridad que le da su empleo para servirse a sí mismo; con más sentido de propósito inclinado hacia su bienestar personal y éxito en sus aspiraciones políticas, que lealtad al servicio público. ¿Cuántos empleados públicos, candidatos a elección o inmersos en campaña podrán resistir la tentación de utilizar los medios y recursos que el empleo pone a su alcance para premiar partidarios y castigar los adversarios? ¿Qué podrá contener la sutil represalia y la callada venganza del empleado público derrotado en sus planes políticos? Estas sencillas realidades, más que el criterio desarrollado en tesis abstractas sobre los derechos del individuo son las que deben guiar este Tribunal en la interpretación de la Constitución. Los remedios provistos por nuestro Derecho positivo para proteger al empleado público de la persecución, el discrimen y la erosión política no deben estar al servicio del empleado *público-político activo*. El interés del Estado en conservar un cuerpo de servidores públicos diestros, competentes y objetivos, posterga toda consideración del reclamo personal del empleado para hacer campaña o lanzar su candidatura a cargo electivo desde la plataforma de su empleo. La incompatibilidad entre servir al pueblo y servirse a uno mismo hiere la retina. La fundamental igualdad ante la ley impugna y excluye esta doble personalidad de servidor público y político, con ventajas y mecanismos de fomento del provecho personal que no tienen ni otros candidatos a elección, ni tampoco otros empleados. La decisión apelada no sólo relega a último plano el superior interés de esta sociedad, conocido en la jurisprudencia norteamericana como *"compelling state interest"*, sino que esculpe

y dota de nimbo constitucional una figura de privilegio, autorizada a operar en campos irreconciliables.

■ La Ley de Seguridad de Empleo, en su Art. 14, impugnado, no está herida de discrimen inaceptable porque en Puerto Rico, a diferencia de los estados de la Unión, la prohibición de actividad política se aplique en forma selectiva a determinados grupos de funcionarios y empleados como jueces, miembros de la Policía de Puerto Rico y los que ahora nos ocupan empleados de la Administración de Seguridad de Empleo. La prueba de ácido para las clasificaciones legislativas ha tenido un desarrollo que va desde el criterio tradicional a tenor del cual se sostendrá la clasificación a menos que sea claramente arbitraria y carente de nexo alguno con un interés legítimo del Estado, hasta el de estricto escrutinio judicial que para el caso de clasificación inherentemente sospechosa impone al Estado la obligación de establecer la existencia de un interés público apremiante (*compelling state interest*) que se atiende y promueve con la clasificación. *Zachry International* v. *Tribunal Superior*, 104 D.P.R. 267, 277–278 (1975); *Frontiero* v. *Richardson*, 411 U.S. 677, 688 (1973). En el presente caso, el superior interés del Estado en erradicar la política del área de personal y proteger la estabilidad, integridad y eficiencia en un sistema administrativo capaz de sobrevivir cualquier cambio político en la dirección del Gobierno imparte una calidad a la reglamentación legislada en el citado Art. 14, que satisface aun el rigor del estricto escrutinio judicial.

■ En la cuestionada disposición de la Ley de Seguridad de Empleo se percibe la intención legislativa de Puerto Rico de imponer la prohibición en áreas particularmente sensitivas del servicio público, en las cuales la imparcialidad y objetividad se enervan con levísima desviación partidista de los incumbentes; o en las que la dispensa de oportunidades y beneficios a grandes números de personas da margen para convertir el empleo en agencia de favores especiales, en opera-

ción proselitista masiva. Los fondos que esta agencia distribuye mediante entrega directa al beneficiario son cuantiosísimos; y sus propios empleados son los que evalúan y determinan la calificación del trabajador para recibirlos. 29 L.P.R.A. secs. 703, 704. Los beneficiarios del programa se cuentan por miles. Su voto se hace sentir. No todos los empleados públicos tienen el mismo contacto directo con el pueblo al que sirven, ni los medios a su disposición para hacer sentir el peso de su posición con efectos electorales sobre sus adversarios políticos. Sobre esa base el legislador ha podido identificar criterios de diferenciación que justifican la proscripción selectiva de la actividad política entre el personal gubernamental. No adolece de endeblez constitucional un esquema que separa y distingue entre empleados sobre dicha base racional de susceptibilidad a la mala práctica. La clasificación sobre bases de razonabilidad responde a criterios tolerantes y estimativos de esta difícil e ineludible función legislativa de trazar las líneas de distinción. La perfección al crear las clasificaciones no es posible ni necesaria. La acción de la Asamblea Legislativa debe presumirse válida. *Massachusetts Bd. of Retirement* v. *Murgia*, 427 U.S. 307, 314 (1976). Sin que ello implique violación de la cláusula de Igual Protección, el Estado puede "ir paso a paso, atendiendo la fase del problema que se muestra más aguda a la mente legislativa. . . . La Asamblea Legislativa puede seleccionar una fase de un campo, y aplicar allí el remedio, olvidando las demás . . . . [Citas] La cláusula de Igual Protección no requiere del Estado elegir entre atacar todos los aspectos del problema o desistir de todo ataque." *Geduldig* v. *Aiello*, 417 U.S. 484, 495 (1974). *Wackenhut Corp.* v. *Rodríguez Aponte*, 100 D.P.R. 518, 530 (1972); *Miranda* v. *Sec. de Hacienda*, 77 D.P.R. 171, 178 y ss. (1954). La igual protección de las leyes no se extiende para amparar la desigual ventaja personal, y menos para propiciar la corrupción y el discrimen por parte del empleado.

Reconociendo que no puede haber existencia personal donde falta la libertad y que ésta se halla en la misma raíz

metafísica de la vida, mucho antes que las Constituciones de hoy sentenció el Rey Alfonso X el Sabio: "La persona del home es la mas noble cosa del mundo." (Partida VII, tít. 1, Ley 26.) Mas en nuestra compleja sociedad no cabe el concepto de la libertad absoluta y desbocada en erosión de la vida institucional. La sentencia revisada sacrifica ésta en el altar de un liberalismo extremo, rechazado aun en la Declaración Universal de los Derechos del Hombre por las Naciones Unidas (París, 10 diciembre, 1948), que en su Art. 29 proclama: "En el ejercicio de sus derechos y en el disfrute de sus libertades, toda persona estará solamente sujeta a las limitaciones establecidas por la ley con el único fin de asegurar el reconocimiento y el respeto de los derechos y libertades de los demás, y de satisfacer las justas exigencias de la moral, del orden público y del BIENESTAR GENERAL en una sociedad democrática."

▬▬▬ La libertad jurídica no es la libertad amorfa o abstracta, sino la reconciliada con el orden, (²) la organizada y precisa y aun recortada en sus bordes para armonizarla con las múltiples instituciones sociales y jurídicas que hacen posible su existencia.

En Puerto Rico padecemos de algún retraso en los mecanismos de separación de la política y el servicio público, y deberíamos emular los Estados de la Unión en extender la prohibición de actividad política al cuerpo general de servidores públicos de carrera sin distingos ni clasificaciones aun cuando basados en criterios razonables de diferenciación. Mas la re-

---

(²) Las garantías de la Primera Enmienda jamás han significado que personas que desean difundir (*propagandize*) protestas o puntos de vista tienen un derecho constitucional a hacerlo cuándo, cómo y dónde les plazca. *Adderley* v. *Florida*, 385 U.S. 39, 48. Los derechos esenciales garantizados por la Primera Enmienda en ocasiones están sujetos a una elemental necesidad de orden sin el cual la garantía de los derechos civiles de los demás sería una burla. Nuevamente hemos de equilibrar la extensión de las garantías de libertad contra legislación del Congreso tendiente a proteger la sociedad democrática contra el presunto mal de la política partidista practicada por empleados gubernamentales clasificados. *United Public Workers of America* v. *Mitchell*, 330 U.S. 75, 95–96 (1947).

ducción de ámbito de nuestra legislación no es razón válida para sacrificar el interés público en el caso específico de los empleados de la Administración de Seguridad de Empleo a un llamado derecho a *igual* protección de las leyes que como hemos demostrado resulta ser una *doble* protección de las leyes.

█ El sustancial avance que hasta ahora ha alcanzado la erradicación de la política del servicio público y la protección del servidor público en su derecho a un trabajo del que no podrá ser removido sin justa causa, son valores respetables de nuestra vida de pueblo que la Asamblea Legislativa está llamada a preservar.

*La sentencia apelada será revocada.*

El Juez Presidente Señor Trías Monge emitió opinión disidente a la que se unen los Jueces Asociados Señores Torres Rigual e Irizarry Yunqué.

—O—

Opinión disidente del Juez Presidente, Señor Trías Monge, a la que se unen los Jueces Asociados Señores Torres Rigual e Irizarry Yunqué.

San Juan, Puerto Rico, a 5 de octubre de 1978

La recurrida, señora Carmen N. Hermina González, Entrevistadora II en el Negociado de Seguridad de Empleo del Departamento del Trabajo de Puerto Rico, fue seleccionada por el Partido Socialista Puertorriqueño como candidata al Senado por el distrito de Arecibo para las elecciones generales de 1976. La recurrida ocupaba su puesto con carácter permanente. No ejercía funciones de confianza ni conllevaba su empleo la facultad de establecer normas ni directrices.

El 31 de agosto de 1976 el Director del Negociado de Seguridad de Empleo le concedió cinco días a la señora Hermina González para renunciar a su cargo. Fundó el Director su requerimiento en que el Art. 14 (f) de la Ley de Seguridad de

Empleo de Puerto Rico, Ley Núm. 74 de 21 de junio de 1956, 29 L.P.R.A. 713(f), "prohíbe a los empleados del Negociado de Seguridad de Empleo de Puerto Rico ser candidatos a un puesto político en unas elecciones partidistas." El 5 de setiembre de 1976 la recurrida fue removida de su puesto y al día siguiente impugnó la constitucionalidad del referido artículo. El Tribunal Superior declaró inconstitucional el Art. 14(f)(1) y (2) de la Ley y ordenó la reposición de la recurrida, con paga atrasada. El Secretario del Trabajo ha apelado de esa determinación.

El Art. 14(f)(1) y (2) de la Ley de Seguridad de Empleo provee:

"(f) Prohibición contra actividad política.—(1) Ningún funcionario o empleado que trabaje en la administración de este Capítulo podrá (A) usar su autoridad oficial o influencia con el propósito de intervenir en una elección o selección de candidatos para cualquier posición, o que afecte el resultado de las mismas, o (B) directa o indirectamente ejercer o intentar ejercer coerción, ordenar o aconsejar a cualquier otro de tales empleados a pagar, prestar o contribuir con parte de su sueldo o compensación o cualquier otra cosa de valor a cualquier partido, comité, organización, agencia o persona para fines políticos. Ninguno de tales funcionarios o empleados podrá tomar parte activa en la dirección de la política o en campañas políticas. Todas dichas personas retendrán el derecho a votar según ellas escojan y a expresar sus opiniones en toda cuestión política y sobre candidatos. A los fines de esta subsección el término 'funcionario o empleado' no incluirá (A) al Gobernador; (B) jefes debidamente electos o nombrados de departamentos ejecutivos del Gobierno de Puerto Rico, o los de cualquier municipio que no pertenezcan al Servicio por Oposición del Gobierno del Estado Libre Asociado; (C) funcionarios que ocupan posiciones electivas.

(2) Cualquier funcionario o empleado que trabaje en la administración de este Capítulo que viole las disposiciones de esta subsección será inmediatamente separado de la posición o del cargo que ocupe y desde ese momento no se usarán fondos asignados por la Asamblea Legislativa o concedidos por cualquier agencia del Gobierno Federal para pagar la compensación de tal persona."

La validez de esta disposición puede analizarse a la luz de diversas cláusulas y doctrinas constitucionales. (¹) Para los fines de este caso basta con examinar si la citada disposición cumple con los requisitos de la igual protección de las leyes bajo la Constitución del Estado Libre Asociado de Puerto Rico.

En Estados Unidos se han formulado variados criterios para medir el cumplimiento de la cláusula análoga de la Constitución federal. (²) Existen el llamado enfoque de dos niveles, el de tres niveles y muchos más. El desarrollo en Estados Unidos de diferentes criterios para garantizar la igual protección de las leyes es generalmente el producto de cambios en la composición del Tribunal Supremo estadounidense y circunstancias historicosociales propias de dicho país. Véase: Gunther, *The Supreme Court 1971 Term, Foreword: In*

---

(¹) Entre otras cláusulas de la Constitución del Estado Libre Asociado que cabría discutir aquí se cuentan las que garantizan la libertad de expresión (Art. II, sec. 4); la igualdad ante la ley (II, 1); la igual protección de las leyes (II, 7); el libre ejercicio de la franquicia electoral (II, 2); el debido proceso de ley (II, 7); y otros derechos reservados al pueblo (II, 19). El impacto sobre este litigio de la doctrina de las condiciones inconstitucionales es tema también que normalmente requeriría análisis. *Keyishian* v. *Board of Regents*, 385 U.S. 589 (1967); *Pickering* v. *Board of Education*, 391 U.S. 563 (1968); Bruff, *Unconstitutional Conditions Upon Public Employment: New Departures in the Protection of First Amendment Rights*, 21 Hastings L.J. 129 (1969); Ramírez Lavandero, *La Doctrina de las 'Condiciones Inconstitucionales' en Puerto Rico*, 12 Rev. Jur. U.I.A. 111 (1977). También suscita problemas en este tipo de caso la teoría de la amplitud estatutaria excesiva. *Minielly* v. *State*, 411 P.2d 69 (Ore. 1966); Note, *The Public Employee and Political Activity*, 3 Suffolk U. L. Rev. 380, 388–389 (1959). Es innecesario pronunciarnos sobre los anteriores extremos en vista de las conclusiones a que más adelante llegamos en esta opinión.

(²) Debemos recordar al respecto que las decisiones del Tribunal Supremo de Estados Unidos delimitan únicamente el ámbito de los derechos garantizados por la Constitución federal. Los tribunales estatales no pueden achicar esos derechos al interpretar cláusulas análogas en las constituciones locales, pero pueden ampliarlos. Brennan, *State Constitutions and the Protection of Individual Rights*, 90 Harv. L. Rev. 489 (1977); Howard, *State Courts and Constitutional Rights in the Day of the Burger Court*, 62 Va. L. Rev. 873 (1976).

*Search of Evolving Doctrine on a Changing Court: A Model for a Newer Equal Protection*, 86 Harv. L. Rev. 1 (1972).

El enfoque de los dos niveles se compone de un criterio tradicional mínimo—la prueba del nexo racional entre el propósito y los medios del estatuto, a cuyos componentes y evolución nos referiremos luego—y del criterio del escrutinio estricto o examen minucioso. Se utiliza usualmente el examen minucioso cuando la clasificación afecta derechos fundamentales del ciudadano o entraña una diferenciación sospechosa. *Zachry International* v. *Tribunal Superior*, 104 D.P.R. 267, 277 (1975); Note, *Equal Protection: Modes of Analysis in the Burger Court*, 53 Denver L. J. 687 (1976); Bice, *Standards of Judicial Review under the Equal Protection and Due Process Clauses*, 50 So. Cal. L. Rev. 689 (1977); Notes, *Of Interests, Fundamental and Compelling: The Emerging Constitutional Balance*, 57 Boston U. L. Rev. 462 (1977).

La estructuración de un análisis intermedio, más riguroso que el criterio tradicional mínimo pero menos que el del escrutinio estricto, representa el tercer nivel a que nos hemos referido antes. *Craig* v. *Boren*, 429 U.S. 190 (1976); L. Tribe, *American Constitutional Law*, The Foundation Press, N.Y., 1973, secs. 16–30 y 16–31. En términos históricos el criterio tradicional se produjo en época de escasa inclinación del Tribunal Supremo de Estados Unidos a intervenir con las clasificaciones que el Congreso establecía. El criterio del examen minucioso se desarrolló principalmente bajo la presidencia del Juez Warren y el análisis intermedio corresponde en esencia al período siguiente, de menos activismo judicial.

Diversos jueces y comentaristas han criticado la división en dos o tres clasificaciones, más o menos inflexibles, de las diferentes situaciones en que se invoca la igual protección de las leyes y sugieren criterios más amplios. El Juez Marshall ha escrito:

"Para comenzar, debo expresar nuevamente mi desacuerdo con el tratamiento rígido por el Tribunal de la igual protección

de las leyes. [Citas omitidas.] El Tribunal desea aparentemente establecer hoy que los pleitos sobre la igual protección de las leyes son divisibles en dos categorías nítidas que gobiernan el criterio de revisión a aplicarse—el escrutinio estricto o la mera razonabilidad. Mas las decisiones de la Corte en este campo se rebelan ante un método de clasificación tan fácil." *San Antonio School District* v. *Rodríguez,* 411 U.S. 1, 98 (1973). (Traducción nuestra.)

Véanse también las expresiones del Juez Stevens en *Craig* v. *Boren,* 429 U.S. 190, 212 (1976), y Gunther, *The Supreme Court 1971 Term, Foreword: In Search of Evolving Doctrine on a Changing Court: A Model for a Newer Equal Protection,* 86 Harv. L. Rev. 1 (1972); L. Hand, *The Bill of Rights,* 66–67 (1958); Notes, *Of Interests, Fundamental and Compelling: the Emerging Constitutional Balance,* 57 Boston U. L. Rev. 462, n. 3 (1977). La crítica a los criterios reseñados generalmente se funda en el argumento que la garantía de la igual protección de las leyes es de índole necesariamente unitaria. Según expresó el Juez Stevens en *Craig,* supra, 211–212,

"Existe una sola cláusula sobre la igual protección de las leyes. Requiere que cada estado gobierne imparcialmente y no ordena que los tribunales apliquen un criterio de revisión en algunos casos y uno diferente en otros." (Traducción nuestra.)

Lo que ocurre es que a menudo hay que sopesar derechos, resolver pugnas de valores, establecer que unos tienen que ceder ante otros en situaciones determinadas. Desde este punto de vista, los criterios discutidos representan un atrecho, una taquigrafía jurídica, una forma de establecer el necesario equilibrio de intereses. El peligro consiste en olvidar que tal es la naturaleza de los referidos criterios y que su uso no nos releva de la obligación de identificar y conciliar los intereses en conflicto y articular las razones para la solución escogida.(3)

---

(3) En *Zachry International* v. *Tribunal Superior,* 104 D.P.R. 267 (1975) y *Figueroa Ferrer* v. *E.L.A.,* 107 D.P.R. 250 (1978), este Tribunal

No es imprescindible adentrarnos más en el caso de autos en el problema del enfoque adecuado para la recta interpretación de la igual protección de las leyes. El estatuto impugnado en este litigio resulta claramente inconstitucional aun bajo el criterio tradicional mínimo, conforme ha evolucionado este enfoque. ([4])

El criterio tradicional mínimo se ha utilizado en nuevas formas en los últimos años. Raras veces su uso provocaba antiguamente la invalidación de un estatuto. La situación ha ido cambiando en Estados Unidos. Véanse: *Reed* v. *Reed*, 404 U.S. 71, 76 (1971), y *Eisenstadt* v. *Baird*, 405 U.S. 438 (1972), en que se anularon diversas leyes por no hallar los tribunales nexo racional entre la clasificación establecida y el propósito del estatuto.

El criterio del nexo racional exige que las clasificaciones que establezca una Asamblea Legislativa cumplan propósitos legítimos y tengan una relación racional con tales metas. Bice, *Standards of Judicial Review under the Equal Protection and Due Process Clauses*, 50 So. Cal. L. Rev. 689, 698 y ss. (1977); *Eisenstadt*, supra. El ámbito de la clasificación es

---

fue más allá que a la simple referencia al criterio del examen minucioso y procedió al análisis de los intereses encontrados. Adviértase, además, que el escrutinio estricto se aplicó en forma independiente a su uso en circunstancias parecidas en Estados Unidos. En *Zachry*, por ejemplo, resolvimos que las clasificaciones basadas en sexo están sujetas a escrutinio estricto. El Tribunal Supremo de Estados Unidos aplica en tales casos la teoría del escrutinio intermedio. *Craig* v. *Boren*, 429 U.S. 190 (1976).

([4]) Existe aun base respetable para la aplicación del examen minucioso. El Tribunal Supremo de Estados Unidos no ha empleado este criterio, pero sí diversas cortes estatales. *United Public Workers* v. *Mitchell*, 330 U.S. 75 (1947); *Civil Service Commission* v. *National Association of Letter Carriers*, 413 U.S. 548 (1973); *Broadrick* v. *Oklahoma*, 413 U.S. 601 (1973); cf. *Minielly* v. *State*, 411 P.2d 69 (Ore. 1966); *Kinnear* v. *City and County of San Francisco*, 392 P.2d 391 (Calif. 1964); *Bagley* v. *Washington Township Hospital District*, 421 P.2d 409 (Calif. 1966); *De Stefano* v. *Wilson*, 233 A.2d 682 (N.J. 1967); *Commonwealth ex rel. Specter* v. *Moak*, 307 A.2d 884 (Pa. 1973); *State* v. *City of Follansbee*, 233 S.E.2d 419 (W. Va. 1977). Con más razón hay base para la utilización del criterio intermedio, pues lo menos que puede decirse del derecho a postularse para un cargo público electivo es que representa un derecho importante, si no fundamental.

también importante. No debe cubrir individuos o asuntos irrelevantes al objetivo estatutario o excluir aquellos que lo son. La clasificación debe ser precisa. Tussman y tenBroek, *The Equal Protection of the Laws*, 37 Calif. L. Rev. 341, 343–353 (1949); Note, *Legislative Purpose, Rationality and Equal Protection*, 82 Yale L.J. 123, 124 (1972).

¿Qué propósito persigue el Art. 14(f) de la Ley de Seguridad de Empleo? ¿A qué obedeció su inclusión en el esquema estatutario? El propio recurrente contesta estas preguntas, citando el informe sometido por el Departamento del Trabajo a la Asamblea Legislativa.([5]) Este informe explica así la razón de la Sec. 13(f) del P. de la C. 1329, hoy 14(f) de la Ley:

"(f) *Prohibición contra intervención política.* La sección 13(f) se incluye porque los empleados de las agencias de seguridad de empleo estatales son pagados de fondos federales y están, por lo tanto, sujetos a las disposiciones de la Ley Hatch y prohibidos [*sic*] de participar en actividades políticas."

Adviértase que la disposición legislativa bajo examen no intenta prohibirle determinadas actividades políticas a la generalidad de los empleados federales, como en el caso de la Ley Hatch, Pub. L. 89–554, 6 de setiembre de 1966, 80 Stat. 525, 5 U.S.C.A. sec. 7321 y ss., o siquiera a la casi totalidad de los empleados estatales subvencionados por fondos de los Estados Unidos, 5 U.S.C.A. sec. 1501 y ss. La clasificación en el caso de autos afecta directa y exclusivamente a las personas que laboran en el Fondo de Seguridad de Empleo. No se incluye en la clasificación a otros empleados públicos similarmente situados. Aun presumiendo sin resolver que es constitucionalmente permisible limitar los derechos de un grupo de ciudadanos para que el gobierno de Puerto Rico pueda ob-

---

([5]) El informe es parte del récord oficial sobre el P. de la C. 1329, proyecto que se convirtió en la Ley de Seguridad de Empleo, Ley Núm. 74 de 21 de junio de 1956. En el *Diario de Sesiones* no se debate la Sec. 13(f), hoy Art. 14(f) de dicha pieza legislativa. La versión de dicho artículo sometida por el Departamento del Trabajo se aprueba sin enmiendas.

tener ciertos fondos federales, el Art. 14(f) es nulo por distinguir irrazonablemente entre empleados en posición comparable.

Pero hay más. La premisa que motiva la inserción del Art. 14(f) en la Ley de Seguridad de Empleo está equivocada. La legislación federal no se aplica a la situación presente.([6]) Como si fuera poco, aun en el caso de los empleados de los estados de la Unión Americana afectados por la legislación federal, es a la Comisión de Servicio Civil de Estados Unidos y no al Departamento del Trabajo de Puerto Rico a quien corresponde determinar si se ha violado la ley, 5 U.S.C.A. secs. 1504-1505, y es únicamente cuando no se cumple con la orden de la Comisión, la que puede determinar que la violación cometida no exige la remoción del cargo, 5 U.S.C.A. sec. 1505(2), que puede peligrar la concesión de fondos federales. 5 U.S.C.A. sec. 1506. El Art. 14(f) de la Ley de Seguridad de Empleo se ampara en una interpretación diáfanamente errónea de la legislación federal, lo que acentúa la ausencia de nexo racional entre propósito y medios en el caso de autos.

Si nos apartamos de las clasificaciones convencionales en este campo y ponderamos los problemas valorativos envueltos vemos aun con mayor claridad la grave deficiencia constitucional de enfoques como el que representa el Art. 14(f). El derecho a ser candidato a un cargo público electivo es un

---

([6])La ley federal, 5 U.S.C.A. sec. 1503, dispone expresamente en su versión oficial:

"Section 1502(a)(3) of this title [la que prohíbe que empleados estatales que se dedican principalmente a actividades subvencionadas por fondos federales se postulen en elecciones generales a cargos públicos electivos] does not prohibit any State or local officer or employee from being a candidate in any election if none of the candidates is to be nominated or elected at such election as representing a party any of whose candidates for Presidential elector received votes in the last preceding election at which Presidential electors were selected."

Los candidatos de los partidos políticos puertorriqueños no toman parte, como es sabido, en las elecciones para la selección de electores presidenciales.

derecho de importancia indisputable, mas no absoluto. El Estado puede legítimamente subordinar ese derecho, siempre que el estatuto que se diseñe a tal fin no peque de vaguedad, amplitud excesiva, discrimen u otras fallas constitucionales conocidas, al propósito de establecer un servicio civil despolitizado. En tal pugna de valores este segundo interés puede merecer en determinadas circunstancias un rango mayor que el derecho a postularse como candidato a un cargo público. Mas no es tal el conflicto de valores que este caso plantea. A distinción de los cincuenta estados de la Unión Americana, todos los cuales han aprobado versiones de la Ley Hatch, *Broadrick* v. *Oklahoma*, 413 U.S. 601, 604, n. 2 (1973), Puerto Rico anda a la zaga del esfuerzo de separar la política y el servicio público. Existen tan solo instancias aisladas de prohibición: la impuesta a los jueces por la Sec. 12 del Art. V de la Constitución; la aplicable por la Regla 23.0 del Reglamento de la Administración del Sistema de Personal de la Rama Judicial; la referente a los miembros de la Policía de Puerto Rico, Ley Núm. 26 de 22 de agosto de 1974, Parte 2, Art. 24, 25 L.P.R.A. sec. 1024; y el Art. 14(f) de la Ley de Seguridad de Empleo. En cuanto a los maestros del sistema de Instrucción Pública se sigue un plan diametralmente distinto. Nuestra legislación les reconoce a los maestros el derecho a participar en campañas políticas y a ser candidatos para cargos públicos o electivos, con derecho a licencia con paga, Ley Núm. 25 de 3 de junio de 1960, según enmendada, 18 L.P.R.A. 249d.([7]) No existe el menor indicio en el historial legislativo de la Ley de Seguridad de Empleo revelador de intención alguna de que la inclusión del Art. 14(f) se inspiró en el deseo de mejorar el servicio público o en el reconocimiento de que las funciones desempeñadas por los empleados concernidos exigía, a diferencia de otros casos, las

---

([7]) Fuera de nuestra determinación sobre el Art. 14(f) de la Ley de Seguridad de Empleo, nada en esta opinión debe interpretarse como expresión favorable o desfavorable a la constitucionalidad de ninguna ley o reglamento aquí mencionado.

medidas allí delineadas. Por lo contrario, como hemos visto, la génesis del artículo impugnado se debió al interés de obtener unos fondos federales, interés fundado, para colmo, en una interpretación errónea de la legislación federal. En tales circunstancias, no hay valor justificadamente oponible al derecho de la recurrida a la igual protección de las leyes.

Declararía inconstitucional el Art. 14(f)(1) y (2) de la Ley de Seguridad de Empleo, por confligir con la cláusula de igual protección de las leyes de la Sec. 7 del Art. II de la Constitución del Estado Libre Asociado de Puerto Rico, y confirmaría la sentencia apelada.